**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS and AMERICAN PETROLEUM INSTITUTE,<br><br>*Plaintiffs*,<br><br>v.<br><br>LETITIA JAMES, in her official capacity as Attorney General of the State of New York; and AMANDA LEFTON, in her official capacity as Commissioner of the New York State Department of Environmental Conservation,<br><br>*Defendants*. | Civil Action No. 1:26-cv-7203<br><br>**COMPLAINT** |

Plaintiffs American Fuel & Petrochemical Manufacturers and American Petroleum Institute bring this action and allege as follows:

## I. INTRODUCTION

1. The oil and gas industry provides inestimable benefits to the United States and its citizens. Through a vast interstate network of oil and natural gas fields, pipelines, refineries, fuel terminals, and fueling stations, Americans enjoy affordable, reliable, and secure access to energy that powers our cars; heats our homes; cooks our food; propels the ships, trains, and trucks that bring goods to our shores and cities; and enables us to travel thousands of miles on jet planes in a matter of hours to visit friends and relatives.

2. Because of this sector's vital national role, Congress has carefully crafted laws and regulations that seek to provide a stable nationwide regulatory foundation on which the interstate oil and gas sector operates. Most relevant here, Congress has enacted the Clean Air Act, a

comprehensive statute that carefully delineates between federal and state roles in regulating greenhouse gas ("GHG") emissions and has charged the U.S. Environmental Protection Agency ("EPA") with overseeing this statute. Consistent with its Congressional mandate, the EPA monitors, regulates, and tracks GHG emissions across the country, publishes an annual "comprehensive accounting of total greenhouse gas emissions for all man-made sources in the United States,"[1] and administers a GHG reporting program.

3. Notwithstanding this expansive federal regulatory scheme and basic constitutional principles like federalism, free speech, and federal supremacy, the New York State Department of Environmental Conservation ("NYSDEC") recently promulgated its own "Mandatory Greenhouse Gas Reporting Program," codified at 6 NYCRR Part 253 ("Part 253"), under the claimed mandate of a 2019 New York statute establishing statewide GHG emissions reduction targets, the Climate Leadership and Community Protection Act ("Climate Act" or "CLCPA"). When the CLCPA was signed in 2019, then-Governor Andrew Cuomo called it "the most aggressive climate law in the United States of America" and voiced his intent to have New York "lead the way in developing the largest source of offshore wind power in the nation."[2]

4. Part 253 imposes a complex, unprecedented reporting regime on energy-industry participants across the country, whether or not they are located or do business in New York.

5. Most notably, Part 253 does not merely require reporting of emissions within New York. It compels out-of-state entities—many located hundreds or even thousands of miles from the State—to register with NYSDEC and report detailed, commercially sensitive, and often

---

[1] EPA, *Inventory of U.S. Greenhouse Gas Emissions and Sinks*, https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks (last updated on June 10, 2026).

[2] New York State, *Governor Cuomo Executes Nation's Largest Offshore Wind Agreement and Signs Historic Climate Leadership and Community Protection Act* (July 18, 2019), https://web.archive.org/web/20190818011602/https://www.governor.ny.gov/news/governor-cuomo-executes-nations-largest-offshore-wind-agreement-and-signs-historic-climate.

proprietary information about oil and gas supplies, products, sources, and markets. Part 253 also purports to empower NYSDEC agents to conduct warrantless inspections of facilities outside New York State and contrives "consent" to such inspections. And it purports to impose significant civil and even criminal penalties for noncompliance.

6. Part 253 affronts numerous constitutional principles. First, Part 253 violates the Dormant Commerce Clause because it discriminates against out-of-state fossil energy interests in favor of in-state energy sources and otherwise imposes substantial compliance burdens on interstate commercial activities wholly outside New York. Second, Part 253 violates the constitutional prohibition on extraterritorial regulation because it purports to require comprehensive reporting from out-of-state entities regarding out-of-state operations and seeks to enforce these obligations beyond New York's jurisdiction. Third, Part 253 violates the First Amendment by compelling overbroad and misleading disclosure (speech), regarding commercially sensitive information, on matters of public controversy without a compelling or substantial governmental interest. Fourth, Part 253 violates the Supremacy Clause because Part 253 is preempted by the Clean Air Act. Fifth, Part 253 violates the Fourth Amendment by contriving consent to warrantless searches and inspections of out-of-state facilities and compelling production of private data without an opportunity for pre-compliance review.

7. Plaintiffs American Fuel & Petrochemical Manufacturers ("AFPM") and American Petroleum Institute ("API") bring this civil action to stop these constitutional violations and ask the Court to enjoin the Defendants from enforcing Part 253 and grant such other relief as may be appropriate.

## II. PARTIES

### *A. Plaintiffs*

8. AFPM is a national, not-for-profit trade association incorporated in Delaware. AFPM represents most of the Nation's refining and petrochemical manufacturing capacity, including the midstream transport that moves products from facilities to consumers.

9. AFPM's 24 refining company members own and operate approximately 88% of U.S. domestic petroleum refining capacity, all of which occurs outside the State of New York. These companies manufacture and sell gasoline and diesel fuels, and many produce biofuels as well. Several AFPM members supply liquid fuels and petroleum products to distributors and customers in New York. AFPM members support nearly 2.8 million quality jobs across all 50 states, contribute to the Nation's economy and national security, and enable the production of thousands of vital products used by families and businesses throughout the United States.

10. Among other things, AFPM is engaged in activities designed to educate AFPM members, industry, and the public regarding federal, state, and local laws and regulations that may affect AFPM members or their business operations. AFPM supports its members' technical efforts to comply with environmental requirements through publishing technical papers and managing production and inventory statistics, petrochemical surveys, and other industry surveys. AFPM brings this action on behalf of itself and its members.

11. API is a nationwide, not-for-profit trade association incorporated in the District of Columbia that represents all segments of America's oil and natural gas industry. API is the worldwide leading body for establishing standards that govern the oil and natural gas industry.

12. API represents approximately 600 members that produce, process, and distribute the majority of the nation's energy, including oil and natural gas products. API members range from the largest integrated companies to the smallest independent oil and gas producers, including

refiners, suppliers, marketers, pipeline operators, marine transporters, and service and supply companies that support the industry. Several API members sell natural gas, liquid fuels, and petroleum products to New York fuel suppliers, supply products to distributors and customers located in New York, or both.

13. Among other things, API is engaged in activities designed to educate API members, industry, and the public regarding federal, state, and local laws and regulations that may affect API members or their business operations. API brings this action on behalf of itself and its members.

### *B. Defendants*

14. Defendant Letitia James is the Attorney General of the State of New York. Attorney General James is empowered to enforce the laws of the State of New York and is responsible for administering and enforcing Part 253 including through article 71 of New York's Environmental Conservation Law, which provides for both civil and criminal penalties. She is sued in her official capacity.

15. Defendant Amanda Lefton is the Commissioner of the New York State Department of Environmental Conservation. Commissioner Lefton is responsible for administering, implementing, and enforcing Part 253. She is sued in her official capacity.

## III. JURISDICTION AND VENUE

16. This action arises under the United States Constitution, including the First, Fourth, and Fourteenth Amendments; the Commerce Clause; Full Faith and Credit Clause; Due Process Clause; Privileges and Immunities Clause; the Supremacy Clause; and the structural principles of federalism.

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action raises federal questions arising under the Constitution and laws of the United States.

18. This Court has authority to grant injunctive and declaratory relief pursuant to 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent legal and equitable powers.

19. Plaintiffs bring this action under 42 U.S.C. § 1983, which provides a cause of action against every person who, under color of state law, subjects any person to the deprivation of rights secured by the Constitution and laws of the United States and under the Court's equity jurisdiction and *Ex parte Young*, 209 U.S. 123 (1908), which permits suits for prospective injunctive and declaratory relief against state officials who are enforcing state law in violation of federal law.[3]

20. Both Plaintiffs have standing to bring this lawsuit. As associations, at least one of each of Plaintiffs' members would have standing to sue in its own right, and the interests that each Plaintiff seeks to protect are germane to the purposes of each respective association. None of the claims asserted herein nor the relief requested requires participation of an individual member.[4]

21. Plaintiffs' members face concrete and particularized injuries that are actual or imminent. Members are directly regulated by Part 253 and are incurring substantial non-recoverable compliance costs, including internal and external labor, IT system modifications, data management, contract administration, and training. Part 253 also compels members to disclose confidential, proprietary, and commercially sensitive information—including data on crude oil sourcing and type, refinery yield, customer identities, supplier and counterparty information, supply chain details, fuel characteristics, and transportation routes—that would cause competitive and financial injury when available to the public. Further, Plaintiffs' members face the imminent threat of warrantless inspections of their out-of-state facilities under Part 253's contrived consent

[3] *Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016) ("[T]he Supreme Court has consistently recognized federal jurisdiction over declaratory- and injunctive-relief actions to prohibit the enforcement of state or municipal orders alleged to violate federal law."); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) ("[I]f an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted.").

[4] *Friends of E. Hampton Airport, Inc.*, 841 F.3d at 144–45 (affirming jurisdiction under *Ex parte Young* over organizational challenges seeking to enjoin local regulations that allegedly violated federal law).

for NYSDEC to access a reporting entity's property. The enforcement deadlines and the threat of significant penalties for noncompliance further demonstrate that these injuries are sufficient to establish Plaintiffs' standing.

22. AFPM and API themselves also suffer concrete injuries from Part 253, which requires each Plaintiff to divert significant organizational resources to assist its members in analyzing Part 253's complex compliance obligations. These diverted resources include the preparation of comprehensive regulatory analyses and coordination of industry-wide responses to Part 253's unprecedented requirements. Part 253 has caused AFPM and API to incur significant expenses in evaluating and understanding this complex regulatory scheme in order to effectively advocate on behalf of the industry. If other states adopt their own reporting regimes, as New York's approach invites, Plaintiffs' resources will be further consumed by a patchwork of state reporting obligations covering interstate GHG emissions that properly belong under the authority of the federal government.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because at least one defendant resides in this District and because a substantial part of the events or omissions giving rise to this action occurred in the Southern District of New York. Defendant James has admitted that the Southern District of New York is a proper venue for cases involving the Attorney General.[5]

[5] *See, e.g.*, Pl.'s Mem. in Opp'n to Def.'s Mot. to Transfer, *New York v. Amazon.com, Inc.*, No. 21 Civ. 1417, 2021 WL 121285065 (S.D.N.Y. Mar. 10, 2021).

## IV. PART 253 IS UNCONSTITUTIONAL

### *A. Comprehensive Federal Laws Govern GHG Emissions and Reporting*

24. The Second Circuit has recognized that "greenhouse gas emissions are the subject of numerous federal statutory regimes and international treaties. These laws provide interlocking frameworks for regulating greenhouse gas emissions, as well as enforcement mechanisms to ensure that those regulations are followed."[6] In particular, the Clean Air Act, 42 U.S.C. §§ 7401 et seq., establishes a comprehensive federal scheme for regulating air emissions including GHGs.[7]

25. In 2008, Congress mandated adoption of the Greenhouse Gas Reporting Program ("GHGRP"), 40 C.F.R. Part 98.[8] The EPA promulgated the GHGRP pursuant to Clean Air Act authority.[9] The GHGRP embodies the federal government's current approach to GHG emissions reporting and establishes mandatory GHG reporting requirements for facilities that emit 25,000 metric tons or more of $CO_2$ equivalent per year.[10] Although the EPA recently proposed changes to the GHGRP that would remove petroleum refineries and fuel suppliers (among others) from GHGRP reporting and suspend reporting under the EPA's Subpart W[11] until 2034 for certain other oil and gas production facilities (among others),[12] the EPA retains the authority to determine whether, when, and how to implement GHG reporting.[13] Section 114 of the Clean Air Act authorizes the EPA to require reporting of certain emissions information.[14] In these respects,

---

[6] *City of New York v. Chevron Corp.*, 993 F.3d 81, 86 (2d Cir. 2021).
[7] *See id.*
[8] *See* Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, 121 Stat. 1844, 2128 (2008).
[9] Mandatory Reporting of Greenhouse Gases, 74 Fed. Reg. 56260, 56264 (Oct. 30, 2009).
[10] 40 C.F.R. § 98.121.
[11] Under its comprehensive authority to regulate GHG emissions, the EPA has established a "Petroleum and Natural Gas Systems" source category for purposes of the GHGRP under 40 CFR Part 98, Subpart W. The EPA has explained that these reports are used to inform emissions calculations for purposes of federal requirements.
[12] *See* Reconsideration of the Greenhouse Gas Reporting Program, 90 Fed. Reg. 44591 (Sep. 16, 2025).
[13] *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 424-26 (2011) (explaining that "Congress delegated to the EPA the decision whether and how to regulate" air pollutants). As of the date of filing of this Complaint, the EPA has not issued a rule finalizing any aspect of its proposal.
[14] 42 U.S.C. § 7414.

Congress has given EPA—not the states—the authority to administer reporting of GHG emissions information under nationally prescribed circumstances.

### ***B. New York Adopts Part 253, Mandating an Unprecedented GHG Reporting Regime Targeting Out-of-State Activities***

26. Notwithstanding these comprehensive federal regulations and the limits on a state's power to regulate beyond its borders, NYSDEC finalized Part 253 with its unprecedented measures targeting out-of-state activities.

27. Part 253 establishes a mandatory reporting program and applies to "GHG emission sources" if their "annual emissions or activity" meet or exceed the applicable thresholds in any single emissions year from 2023 through 2025, or any year thereafter.[15] All GHG emission sources exceeding Part 253's applicable thresholds qualify as reporting entities and must develop, submit, and certify GHG emissions data reports to NYSDEC each year, beginning with the 2026 emissions year.[16]

28. Part 253 purports to impose reporting requirements on a vast cross-section of the oil and gas industry. The "GHG emissions sources" required to report include at least six categories of reporting entities—(a) facilities (stationary combustion and process emission sources); (b) fuel suppliers; (c) waste haulers and transporters; (d) electric power entities; (e) agricultural lime and fertilizer suppliers; and (f) anaerobic digestion and liquid waste storage entities—and numerous sub-categories.[17]

29. Further, the "fuel supplier" category alone is expansive. Part 253 requires reporting by at least eleven more sub-categories of "[l]iquid and gaseous fuel suppliers," including position

---

[15] *See* Part 253-1.2(a), (c) (requiring reporting in all future years until the requirements for cessation set forth in subdivisions (n) or (o) of section 1.2 are met).
[16] Part 253-1.2(e), 1.3(b)(368), 1.4(b).
[17] Part 253-1.2(b).

holders; enterers; downstream owners, including below the rack distributors; owners of liquified petroleum gas; energy service companies; operators of interstate or intrastate pipelines delivering gaseous fuels; importers of compressed natural gas ("CNG") or liquified natural gas ("LNG"); local distribution companies ("LDC"); natural gas liquid fractionators; and facilities that make liquid fuel products by liquefying or compressing natural gas received from interstate pipelines.[18] Each type of fuel supplier faces distinct yet overlapping reporting obligations and thresholds that create an intricate web of compliance requirements reaching entities with limited or no actual operations in New York and fuel that may not be used in the State, in part because fuel producers frequently have no control over where their fuel is ultimately sold.

30. The information that must be reported under Part 253 is also extensive. Among other requirements, fuel suppliers must calculate, report, and certify the validity of specified GHG emissions, including upstream out-of-state emissions; fuel quantities by type; the names and physical addresses of upstream entities; transportation distances and modes from the point of origin to the New York border; API gravity;[19] sulfur ratio; heating values; biofuel blend information; and other fuel characteristics.[20]

31. The reporting thresholds for fuel suppliers in particular are extremely low. Generating *any* GHG emissions in supplying natural gas, affected liquid fuel, LNG, or CNG into New York triggers reporting obligations under Part 253.[21] Therefore, as a practical matter, supplying *any* amount of fossil fuels into New York is sufficient to trigger compliance obligations. However, it is unclear whether supplying fuel in general, not just to New York, is also sufficient

[18] Part 253-1.2(i); *see also* Part 253-1.2(b)(2)(i)-(iv) (listing four types of fuel suppliers).
[19] API gravity refers to the scale used by the oil and gas industry to express the density levels of liquid petroleum products. *See e.g.* U.S. Energy Information Administration, *Crude Oils Have Different Quality Characteristics* (July 16, 2012), https://www.eia.gov/todayinenergy/detail.php?id=7110.
[20] *See e.g*. Part 253-1.5, 2.16, 2.17, 2.18.
[21] Part 253-1.2(c)(3)(ii).

to trigger compliance obligations. For example, a supplier of LNG or CNG is defined as "[a] person producing, importing, supplying, distributing, or selling LNG and/or CNG and blends thereof, including," but apparently not limited to, ""importers of [LNG] and [CNG] for sale or consumption to end users in New York."[22]

32. Even if Part 253's applicability thresholds do not draw in fuel suppliers not supplying fuel into New York, the regulation clearly requires reporting by entities located outside New York. For example, even though no petroleum refineries exist in New York State, Part 253 requires "petroleum refiners" to report the type of crude oil processed at the refinery, regardless of whether the crude is used to produce fuel sold in New York.[23]

33. Part 253 also requires reporting of information regarding fuels that specifically do not reach New York. For example, Part 253-2.16(a)(2) requires reporting of emissions from fuels "diverted to non-New York locations." In other instances, the fuel supplier bears the burden of proving that commingled fuels within the national market are not subject to reporting because they are destined for end use or sale outside of New York.[24]

34. Through these and other extraterritorial requirements, NYSDEC attempts to extend its regulatory authority beyond New York's borders. As explained above, Part 253 requires fuel suppliers to report not only direct GHG emissions from operations within New York, but also upstream, out-of-state emissions and other data associated with fossil fuel or petroleum products potentially, but not necessarily, sold or brought into New York.[25] Part 253 also authorizes NYSDEC to "access any real property at which an emission source exists" during normal business hours to "traverse the property, inspect facilities, take measurements, analyze physical site

[22] Part 253-1.3(b)(407).
[23] Part 253-2.18(c)(2).
[24] *See e.g.* Part 253-2.17(a)(4).
[25] *See e.g.*, Part 253-2.18(a)-(c).

characteristics, take environmental samples, sketch and photograph the property."[26] This inspection authority extends to out-of-state facilities that are covered as reporting entities under Part 253.[27] Part 253 provides that establishment of a reporting account pursuant to Part 253-1.6 may be considered written permission from the owner(s) of the real property for the NYSDEC to access such property.[28] Because reporting entities are required to establish accounts, this provision purports to manufacture consent to warrantless searches as a condition of regulatory compliance.

35. Further, much of the information Part 253 requires to be reported is not readily available, or even accessible to covered entities. This is particularly true because of how petroleum products are transported through the United States and internationally. Refiners (all of whom are located outside New York) generally do not send their products directly into a particular state. Instead, they typically contract with distributors, marketing affiliates, or other third parties when placing product into the national and international fuel markets. Along the way to a particular state, like New York, title and custody of the molecules of product are typically transferred between entities multiple times after leaving the refinery gate and then blended and/or commingled with other molecules in common carrier or storage facilities. Plaintiffs' members supply products within the complex national and international network of these distribution systems. For example, Colonial Pipeline—the largest refined petroleum products pipeline by volume in the United States—transports over 2.5 million barrels of fuel daily (amounting to approximately 45% of all fuel consumed on the East Coast) between the Gulf Coast and the Northeast—although not directly to New York—across 5,500 miles of energy infrastructure in twelve states, including over 270

[26] Part 253-1.2(e)(3).
[27] *See id.*
[28] *See id.*

terminals and 28 Gulf Coast refineries.[29] Other pipelines and fuel transportation routes are used as well. New York is but one destination within this vast interconnected network, and attributing particular molecules that ultimately arrive in New York to specific refineries, crude oil sources, or upstream entities—as Part 253 requires—is impossible, much less verifiable. As such, much of the information sought by Part 253's requirements is often unknown to fuel suppliers.

36. Similar commercial (and technical) realities apply to natural gas. Natural gas consumed in New York is produced from basins located across the United States and transported through an extensive interstate network of gathering systems, processing plants, storage facilities, and transmission pipelines, much of which is located outside New York. Before reaching New York, natural gas may pass through multiple facilities and entities across several states as part of an interconnected national energy market. New York is but one destination within this broader interstate network. Thus, Part 253 will force compliance onto entities that may have zero contact with New York other than the potential that gas running through one of their assets *might* be consumed in New York.

37. In other words, the supply chain for fuels in the national market is like a pool, with many different reporting entities continuously pouring products into the pool and many different reporting entities drawing products out of it. In nearly all instances, there is no reliable way to tie the inbound portion of products to those that ultimately flow out of the pool and into New York, and the only reliable metric is with regard to the latter, outbound portion. As such, a reporting regime that simply requires the reporting of fuels at a specified point in ownership—e.g., the type and volume of product that enters New York or is distributed at the rack in New York—could be used by NYSDEC to, in turn, estimate associated emissions for its own purposes without any of

---

[29] Colonial Pipeline Company, *Our Operations*, https://www.colpipe.com/our-operations/ (last visited Aug. 14, 2026).

Part 253's unnecessary and overlapping requirements, as further described herein. But to force private entities to estimate and report such emissions themselves using controversial and non-factual assumptions is improper and unlawful.

38. Part 253 also requires multiple parties in the same supply chain to report overlapping emissions data concerning the same molecules of product, creating duplicative and potentially conflicting reporting obligations across the supply chain and potentially resulting in double counting. For example, position holders must report the $CO_2$, $CH_4$, $N_2O$, and $CO_2e$ emissions from liquid fuels and petroleum products sold or transferred to large emission sources.[30] The receiving facilities must then separately report their combustion emissions from the same fuel.[31] Thus, both the seller and the buyer are reporting emissions associated with the same fuel—overstating and rendering emissions data inaccurate.

39. Part 253 creates a parallel double counting problem for natural gas suppliers. Part 253-2.17(a) imposes downstream emissions reporting obligations on four categories of natural gas suppliers: (1) natural gas liquid fractionators;[32] (2) LDC, energy service companies, interstate pipeline operators, and intrastate pipeline operators;[33] (3) importers of LNG or CNG into New York;[34] and (4) operators of facilities that produce LNG or CNG products by liquefying or compressing natural gas received from interstate pipelines.[35] It is routine for the same molecule of natural gas to pass through each of these types of facilities on its way to an end user in any particular state, such as New York. Raw natural gas is processed at a fractionator, delivered into interstate pipelines, potentially compressed or liquefied for storage or transport, and ultimately

---

[30] Part 253-2.16(a)(3).
[31] Part 253-2.7.
[32] Part 253-2.17(a)(1).
[33] Part 253-2.17(a)(2).
[34] Part 253-2.17(a)(3).
[35] Part 253-2.17(a)(4).

delivered to an LDC or end consumer. Yet under Part 253, all four categories of suppliers would independently report emissions "that would result from the use" of that same gas.[36]

40. Part 253's definition of "Liquid Fuel or Petroleum Product" is also overbroad, encompassing categories such as lubricants, asphalt, and road oil[37] that are not combusted by the end user and thus have no direct contribution to GHG combustion emissions in New York when produced outside the State, further expanding the regulation's reach beyond any legitimate purpose associated with New York's environmental goals.

### *C. Part 253 Requires Reporting Entities to Use State-Dictated Metrics*

41. Beyond mandating reporting by a wide range of industry participants, Part 253 also tells them what to say. Specifically, Part 253 requires reporting entities to use state-dictated "emissions factors" and provides the equations used to estimate GHG emissions associated with their operations.[38] The state-mandated equations utilize a 20-year global warming potential ("GWP")[39] rather than the internationally recognized 100-year GWP, which results in an overestimate of certain reported GHG emissions.[40] These state-mandated estimates compel covered entities to generate and report information in a manner prescribed by New York, regardless of whether federal methodologies or industry practice would yield different results, and regardless of whether the state-driven estimate is accurate and true.

42. Through Part 253, NYSDEC also reaches into the facilities of large emissions sources, even those located outside New York, and tells them how they must calibrate their

[36] Part 253-2.17(a).
[37] Part 253-1.3(b)(248).
[38] Part 253-2.16(b), 2.17(b).
[39] Part 253-2.16(b), 2.17(b).
[40] The EPA and most other entities utilize a 100-year timeframe (known as "GWP-100") as a metric to compare the warming effects of different greenhouse gases. *See generally* EPA, *Understanding Global Warming Potentials*, https://www.epa.gov/ghgemissions/understanding-global-warming-potentials (last visited Aug. 16, 2026). However, Part 253 measures GHGs using a much less common 20-year timeframe ("GWP-20").

equipment. Part 253-1.4(g) requires large emission sources to calibrate "all flow meter and other measurement devices used to provide data for the GHG emissions calculations or industrial product data" according to New York-specific methods, subject to third-party verification. Indeed, where the results of a calibration assessment fail to meet the required accuracy specifications, the verifier is compelled to note a nonconformance as part of the emissions data verification statement.[41]

### *D. Part 253 Imposes Excessive Burdens on Plaintiffs and Their Members*

43. In addition to its overbroad scope and reach, Part 253 imposes significant burdens on Plaintiffs and their members.

44. As described above, the molecules of products that Plaintiffs' members refine or supply for use or sale in New York are produced, processed, and transported through facilities and supply chains located outside New York. Those molecules may be subject to numerous transactions and are typically commingled with molecules from other market participants at various points in the national distribution chain, which are not necessarily destined for New York, making it impossible to segregate or track the molecules that are ultimately sold in New York. This makes compliance with Part 253 practically unworkable for many entities both in and out-of-state, in most circumstances. Additionally, the numerous assumptions that would have to be made in order to report any semblance of information responsive to Part 253 undermines the quality of any data reported—which is subject to certification, verification, and enforcement—and therefore undermines any legitimate interest New York may have in this data. In other words, Part 253 mandates certified GHG emissions reporting that necessarily will be speculative and inaccurate.

[41] Part 253-1.4(g)(10).

45. Also, data regarding upstream emissions and fuel characteristics is often outside a reporting entity's control and visibility. As such, Part 253 effectively requires Plaintiffs' members to seek information from third parties—including upstream sellers, fuel production facilities, pipeline or terminal operators, trucking and rail carriers, counterparties, and customers—to satisfy its reporting requirements. Members may be unable to obtain such information, and they would need to evaluate whether existing contracts provide access to the required data or whether new contractual provisions are necessary. Many granular data elements required by Part 253 may be held by third parties who are unwilling or unable to share them for competitive reasons. In any case, where Plaintiffs' members are unable to obtain and report the necessary information, they would be subject to Part 253's sizable daily penalties, even for good faith, partial compliance.[42]

46. As noted above, Part 253 requires third-party verification for large emission sources.[43] These verification requirements are not aligned with existing federal programs, which rely on self-certification subject to review and audit, and the compliance timeline provides insufficient phase-in time for reporting entities to engage accredited verification bodies. In fact, NYSDEC itself controls when and whether a verifier receives accreditation.[44] But NYSDEC has admitted that the verification requirements are merely a tool to correct its own self-created issue of double counting described above,[45] undermining any connection to a legitimate governmental interest for the excessive and unduly burdensome requirements.

47. Part 253 also requires Plaintiffs' members to report or make available categories of information that are confidential, proprietary, commercially sensitive, competitively sensitive,

[42] *See* Part 253-1.9.
[43] Part 253-4.1.
[44] Part 253-4.3(c).
[45] *See* NYSDEC, Assessment of Public Comments: 6 NYCRR Part 253, Mandatory Greenhouse Gas Reporting Program at 95 (Dec. 1, 2025) ("verification of both sides of that transaction ensures the Department can accurately prevent the double counting of emissions.").

and/or trade secrets—including data on crude oil and raw natural gas supplies and other fuel inputs, hydrogen production, refinery yield, product slate, supplier and customer identities, and transportation routes.[46] Disclosure of these and other data elements—individually or in combination—invariably reveals highly valuable and protected information about each company's competitive positioning and operations as well as information that could be harmful to competition across the industry. In fact, Part 253 requires disclosure of competitive market information that may otherwise be restricted from industry dissemination under federal law. By default, this information is deemed public when reported under Part 253.[47]

48. Part 253 is inconsistent with the EPA's GHGRP, further burdening entities that already comply with existing reporting frameworks and creating a risk of conflicting obligations across jurisdictions, including because Part 253 compels GHG estimates using unique methodologies contrived by NYSDEC. Part 253 also adds burdens beyond the existing federal requirements by requiring companies to compile, report, or cross-reference data maintained separately under other federal programs.[48] Part 253 creates tension with those federal requirements by requiring consolidation of that separated data in a single report to NYSDEC. Further, Part 253 imposes additional burdens because it demands even more information concerning upstream out-of-state emissions, facilities, transportation, sources, and characteristics than other programs—requirements that create risks of inconsistent or duplicative reporting where other states adopt GHG reporting programs with different requirements, where federal requirements differ, or where information voluntarily reported by entities uses distinct methodologies to inform estimates and calculations.

[46] *See e.g.* Part 253-2.18(b)-(c).
[47] *See* Part 253-1.8.
[48] *See e.g.*, 18 C.F.R. Part 358 (requiring independence in the natural gas transmission and marketing sectors and restricting flow of information from natural gas transmission providers to marketing function employees).

49. Part 253's conflict with EPA's GHGRP is also an excessive burden because it is not appropriate in light of the May 2026 amendments to the CLCPA removing the statutory anchor between Part 253 and its out-of-state reporting requirements and use of the 20-year GWP.[49] But even before the CLCPA was amended, NYSDEC was required to "align, to the extent possible, the new reporting requirements with existing DEC and U.S. Environmental Protection Agency (EPA) GHG emissions reporting programs."[50] NYSDEC ignored this directive to properly orient Part 253 within the Clean Air Act's cooperative federalism framework.

50. Part 253's unique requirements dictate that reporting entities will have to construct and implement new compliance systems. Much of the information Part 253 requires to be reported—such as upstream out-of-state emissions—is not required by other programs, and so this data will need to be generated for the first time. The excessive burdens imposed by Part 253 were not, however, intended to be borne primarily by reporting entities. When passing the CLCPA, the Legislature expected NYSDEC, not regulated entities, to bear the brunt of the responsibility for collecting GHG emissions data and specifically identified the EPA as a source for that data.[51]

---

[49] In May 2026, Governor Kathleen Hochul signed legislation modifying the CLCPA to, among other things, remove "out-of-state" emissions associated with the "extraction and transmission of fossil fuels imported into the state" from the scope of the State's emissions reduction targets and utilize GWP-100 in place of GWP-20. N.Y. S. 9008-C, Part VV §1, 2025–2026 Reg. Sess. (2026); *See* NYSDEC, Assessment of Public Comments: 6 NYCRR Part 253, Mandatory Greenhouse Gas Reporting Program at 100 (Dec. 1, 2025) ("The Department included upstream out-of-state emissions in Part 253 to fulfill the requirements of the Climate Act. Specifically, the Climate Act requires the statewide greenhouse gas emissions total to include emissions from the extraction and transmission of imported fossil fuels into New York.").

[50] New York State Climate Action Council, *Scoping Plan* at 269 (December 2022), https://climate.ny.gov/-/media/Project/Climate/Files/NYS-Climate-Action-Council-Final-Scoping-Plan-2022.pdf; N.Y. Env't Conserv. L. § 75-0109(2)(c) (requiring CLCPA implementing regulations to "[r]eflect, in substantial part, the findings of the scoping plan").

[51] *See* Affirmation of Yvonne E. Hennessey, Ex. A (N.Y.S. Assembly Tr., June 19, 2019), *Am. Petroleum Inst. v. NYSDE*C, No. 904092-26, NYSCEF Doc. No. 22 at 415 (N.Y. Sup. Ct., Albany Cnty. Aug. 10, 2026), https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=QHWuS1f3wg4hzHylVH3BIA= =.

51. Given Part 253's extensive and burdensome requirements, NYSDEC's claim that the administrative costs for complying with Part 253 will be "minimal" is fallacious.[52] The reality is that Part 253 imposes substantial costs on Plaintiffs' members, including internal labor, outside consulting, assurance and verification costs, legal review, IT system modifications, data management, contract administration, training, and ongoing recordkeeping. Furthermore, absent timely relief from this Court, any changes made to Part 253 to align with the recent CLCPA amendments may impose additional costs on Plaintiffs to unwind or alter compliance systems. Many of these costs would likely not be recoverable if Part 253 is later held unlawful.

52. Thus, Part 253's misaligned and overbroad reporting, certification, and verification requirements regarding questionable or unobtainable data are unworkable and impose an extreme burden on Plaintiffs and their members.

### *E. New York Declined to Rectify Industry Concerns Raised During Part 253's Rulemaking*

53. NYSDEC declined to rectify these concerns about out-of-state regulation in the final Part 253 regulations, which were raised during the public notice and comment process. For example, on July 1, 2025, API submitted detailed comments to NYSDEC regarding proposed Part 253. API cautioned that proposed Part 253 impermissibly sought to regulate sources outside New York, potentially globally, and that the regulation would be unnecessary, excessively costly, unduly burdensome, and may not result in accurate reporting.

54. API explained that upstream emissions are often outside a reporting entity's control and visibility; that fuel products are fungible and commingled across facilities and pipelines,

[52] *See* NYSDEC, *Mandatory Greenhouse Gas Reporting Program Frequently Asked Questions*, https://dec.ny.gov/sites/default/files/2025-03/ghgreportingfaq.pdf. NYSDEC only estimates that "verification" costs may be as high as $17,000 "for more complex facilities." *Id.* NYSDEC completely ignores and never estimated the actual anticipated compliance costs for Plaintiffs' members – including oil and gas producers, refiners, suppliers, and transporters operating outside of New York.

making product-origin tracing difficult and costly; that the emissions factors provided do not adequately consider the variability in upstream GHG emissions for oil and gas products; that many granular data elements may be held by third parties who may be unwilling to share them for competitive reasons; that transportation metrics are not otherwise reported in existing frameworks and may be infeasible to obtain; and that the facility-level reporting framework disaggregated by fuel type, component, source, and destination is inconsistent with federal regulatory requirements and creates new and unnecessary burdens.

55. API informed NYSDEC that Part 253 is inconsistent with EPA's GHGRP. API raised double-counting concerns because multiple entities in the same value chain must report the same upstream and downstream emissions.

56. API urged NYSDEC not to compel disclosure of commercially sensitive or proprietary information, including upstream supplier and downstream customer identities, because existing federal programs do not require these disclosures and public disclosures could harm competitiveness. API also urged NYSDEC to align verification requirements with existing federal programs and expressed concerns about compliance challenges and insufficient phase-in time.

57. NYSDEC did not heed API's warnings about the constitutional problems with Part 253. Instead, NYSDEC plowed ahead and finalized Part 253 with the reporting requirements, thresholds, and confidentiality framework to which API and other commenters had objected.

58. AFPM and other industry members, including the New York Reliable Energy Infrastructure Coalition, Marcellus Shale Coalition, and Independent Fuel Terminal Operators Association, also submitted comments during NYSDEC's public comment period, raising similar concerns. They warned that Part 253's requirements to report upstream emissions data across the entire supply chain were unconstitutional, violating the First Amendment's protection from

government-compelled speech, characterizing the compelled GHG disclosures as speech that is "neither factual nor noncontroversial."[53]

59. They further explained that the requirements to report upstream and out-of-state supplier information are unconstitutional under the Dormant Commerce Clause because NYSDEC, as a state agency, is not constitutionally permitted to regulate interstate commerce.[54] AFPM specifically added that requiring reporting on upstream and out-of-state emissions throughout the complex chain of custody for fossil fuels would place an overwhelming burden on the industry, resulting in significant costs and compliance challenges and imposing undue burdens on interstate commerce that would far outweigh any purported benefits to the state of New York.[55] The Independent Fuel Terminal Operators Association added that it would be impossible for fuel suppliers to provide much of the information required by the regulations, particularly regarding upstream out-of-state fuel production and transportation, suggesting that NYSDEC eliminate requirements for information not generally available on commercial product documents.[56] The American Chemistry Council stated that requiring disclosures at the facility level disaggregated by fuel type, component, source, and destination is unwarranted beyond existing legal requirements and should be aligned with federal inventory programs.[57]

60. The industry commenters also stated that Part 253 interferes with federal jurisdiction, is preempted by federal law, and would impose significant compliance burdens and costs that would be passed on to consumers.[58]

---

[53] NYSDEC, Assessment of Public Comments: 6 NYCRR Part 253, Mandatory Greenhouse Gas Reporting Program at 90 (cmt. 294), 146 (cmt. 517) (Dec. 1, 2025).
[54] *Id.* at 90 (cmt. 294).
[55] *Id.* at 327 (cmt. 1136).
[56] *Id.* at 155 (cmt. 547).
[57] *Id.* at 329 (cmt. 1147).
[58] *Id.* at 90 (cmt. 294), 147 (cmt. 519).

61. NYSDEC dismissed these concerns without meaningful analysis in its Assessment of Public Comments. NYSDEC responded simply that the regulations "are necessary for New York State to comply with the statutory directives of the Climate Act," "were developed to be in compliance with the constitutional reach of New York's sovereign authority," "do not unduly or unconstitutionally burden persons' First Amendment rights,"[59] and "[a]ny concerns that the commenter has in regard to third parties would be between the Reporting Entity and that third party."[60]

### *F. Part 253's Implementation is Imminent*

62. Under the text of Part 253, reporting entities must submit their first annual reports to NYSDEC by June 1, 2027.[61] Large emission sources must submit GHG monitoring plans by December 31, 2026.[62]

63. On July 31, 2026, NYSDEC issued a letter stating that it will "use enforcement discretion with respect to certain provisions" of Part 253 on a temporary basis.[63] NYSDEC states that it will not take "enforcement" action through June 30, 2027 for the GHG monitoring plan submittal requirement; through December 31, 2027 for the first annual report; through April 1, 2028 for the first verification statements; and through September 1, 2028 for the second annual report.[64] NYSDEC further states that it is going to "develop a regulatory package to amend Part 253" in response to the May 2026 CLCPA legislative amendments.[65] But NYSDEC still "anticipates full compliance [from industry] with the requirements of the regulation no later than

---

[59] *Id.* at 90.
[60] *Id.* at 60.
[61] Part 253-1.4(b).
[62] Part 253-1.7(e).
[63] NYSDEC, *Enforcement Discretion Part 253, Mandatory Greenhouse Gas Reporting Program* (July 31, 2026), https://dec.ny.gov/sites/default/files/2026-08/enforcementdiscretionletter_part253.pdf.
[64] *Id.*
[65] *Id.*

the extension provided by [the Enforcement Discretion Letter]."[66] Regardless, to meet even the extended "enforcement discretion" deadlines, Plaintiffs and their members must continue to incur substantial burdens and costs to prepare for compliance—especially considering that 2026 remains the first compliance year subject to reporting,[67] which the "enforcement discretion" memorandum leaves intact. Furthermore, any amendments to Part 253 that do not address the constitutional violations described below would only impose additional undue burdens on Plaintiffs' members due to the costs of reviewing and revising compliance frameworks established before and affected by the amendments.

## V. CLAIMS FOR RELIEF

### COUNT I

**Violation of the Dormant Commerce Clause**
*(U.S. Const. art. I, § 8, cl. 3; 42 U.S.C. § 1983; Ex Parte Young.)*

64. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

65. The Commerce Clause of the United States Constitution, Article I, Section 8, Clause 3, reserves to Congress the power to regulate commerce "among the several States." The Dormant Commerce Clause is a negative implication of the Commerce Clause that prohibits state laws that discriminate against, or unduly burden, interstate commerce.

66. A state law violates the Dormant Commerce Clause if it: "(1) 'clearly discriminates against interstate commerce in favor of intrastate commerce'; (2) 'imposes a burden on interstate commerce incommensurate with the local benefits secured'; or (3) 'has the practical effect of

[66] NYSDEC, *Mandatory Greenhouse Gas Reporting*, https://dec.ny.gov/environmental-protection/air-quality/mandatory-greenhouse-gas-reporting (emphasis added).
[67] Part 253-1.4(b).

extraterritorial control of commerce occurring entirely outside the boundaries of the state in question.'"[68]

67. Part 253 violates the Dormant Commerce Clause in each of these ways.

68. First, Part 253 discriminates against interstate commerce on its face by imposing more onerous burdens on fuel suppliers and other covered entities importing fuels into New York than entities distributing fuel produced inside New York. For example, Part 253-2.18(b)(3)-(4) and 2.18(b)(6) requires fuel suppliers to report "[t]he transportation distance of the imported fuel from the fuel production facility … to the New York border in miles[,] the mode of transportation used to transmit the fuel to the New York border" and certain other "data for petroleum fuels [and natural gas] imported into New York." There are no requirements to report analogous information for the in-state transportation of fuel. A law that imposes burdens on out-of-state products in favor of local interests is invalid per se.[69]

69. Part 253 also discriminates against interstate commerce by targeting the interstate fossil fuel industry and those companies who engage in the production, refining, transport, and selling of those fuels while favoring other forms of energy located in New York. Part 253 imposes substantial reporting requirements on petroleum refineries, for example.[70] However, because no petroleum refineries are located in New York, Part 253's refinery reporting obligations exclusively

[68] *Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 113 (2d Cir. 2025) (quoting *Grand River Enters. Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 123 (2d Cir. 2021)). While the Supreme Court has clarified that there is no "'almost per se' rule against state laws with 'extraterritorial effects,'" it recognized that laws that "directly regulated out-of-state transactions by those with no connection to the State" remain invalid under the Dormant Commerce Clause and other prohibitions against extraterritorial regulation. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373, n.1 (2023) (discussing *Healy v. Beer Institute*, 491 U.S. 324 (1989) and *Edgar v. MITE Corp.*, 457 U.S. 624 (1982)).

[69] *Maryland v. Louisiana*, 451 U.S. 725, 756 (1981).

[70] *See e.g.* Part 253-2.16, 2.17, 2.18 (requiring reporting of upstream out-of-state emissions and data, including for refineries, none of which are located in New York, and under which fuel suppliers bear the burden of demonstrating that their fuel has a final destination outside New York, which is typically impossible to do when operating in the national integrated distribution system).

target interstate commerce and favor in-state energy sources like solar and wind. Indeed, when enacting the Climate Act, the statute Part 253 implements, New York's then-governor voiced his intent to have New York "lead the way in developing the largest source of offshore wind power in the nation."[71]

70. Part 253 also facially discriminates against verification bodies outside New York by providing for "additional training and requirements on verifiers, and verification bodies originally accredited outside of New York."[72]

71. Second, Part 253 also imposes a substantial burden on interstate commerce that is clearly excessive in relation to its local benefit. As set forth in more detail above, for example, Part 253 requires Plaintiffs and their members to do the impossible: identify from commingled molecules in interstate commerce those destined for New York and generate records of their sale or receipt, reach out to third parties who may (or may not) be willing or obligated to provide requested information, potentially renegotiate contracts with these entities if they are not willing to provide information that Part 253 purports to require, obtain third-party verifications, and disclose confidential and proprietary information.[73] Part 253 seeks to require reporting of information regarding the out-of-state production, refining, transporting, and supplying of natural gas, gasoline, and other liquid fuels—all fungible products—that are commingled within the *interstate* fuels market. Companies that transport fuel via pipelines that connect to New York have little practical ability to choose whether the company's fuel reaches a supply point in the state. Once fuel enters a pipeline, it commingles with other shipments, making it impossible to stop

[71] New York State, *Governor Cuomo Executes Nation's Largest Offshore Wind Agreement and Signs Historic Climate Leadership and Community Protection Act* (July 18, 2019), https://web.archive.org/web/20190818011602/https://www.governor.ny.gov/news/governor-cuomo-executes-nations-largest-offshore-wind-agreement-and-signs-historic-climate.
[72] *See* Part 253-4.3(b).
[73] *See e.g.* Part 253-2.16, 2.17.

deliveries into New York without also disrupting supply to other regions served by the same pipeline.

72. Against this substantial burden, the public benefits of Part 253 are minimal. Part 253 itself does not reduce GHG emissions (even assuming doing so would be beneficial), protect the environment, or provide more precise emissions data that could purportedly be used for such ends. Instead, it feeds largely speculative, inaccurate information into a bureaucratic black hole with no proximate benefit to New York's citizens. As indicated by the Legislature when considering the CLCPA's directive to consider a GHG reporting program, New Yorkers already have access to extensive GHG emissions data through EPA's GHGRP, EPA's annual National Inventory, Argonne Laboratory's "GREET" Model, and New York's own in-state emissions monitoring.[74] In fact, NYSDEC has successfully issued an annual GHG report, as required by the Climate Act, since 2021 without the data from Part 253.[75] The marginal informational benefit of Part 253's extraterritorial requirements, if any, is vanishingly small compared to the enormous burden it imposes on interstate commerce. The May 2026 amendments to the CLCPA further demonstrate this point. Following removal of out-of-state emissions from the definition of "statewide greenhouse gas emissions" and thus the scope of New York's emissions reduction targets, Part 253's extraterritorial requirements are arguably no longer necessary to comply with the CLCPA's directives. Even assuming Part 253 is necessary at all, a simplified reporting regime for fuel suppliers that tracks fuels at a single point of ownership within New York, as described

---

[74] *See* Affirmation of Yvonne E. Hennessey, Ex. A (N.Y.S. Assembly Tr., June 19, 2019), *Am. Petroleum Inst. v. NYSDEC*, No. 904092-26, NYSCEF Doc. No. 22 at 415 (N.Y. Sup. Ct., Albany Cnty. Aug. 10, 2026), https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=QHWuS1f3wg4hzHylVH3BIA= =.

[75] *See* NYSDEC, *Statewide Greenhouse Gas Emissions Report*, https://dec.ny.gov/environmental-protection/climate-change/greenhouse-gas-emissions-report (last visited Aug. 14, 2026).

above, could be used by NYSDEC to estimate the emissions data that NYSDEC seeks, rendering Part 253 discriminatory and unduly burdensome.

73. Third, Part 253 seeks to directly regulate out-of-state transactions in multiple ways. Part 253-2.18 requires reporting of upstream out-of-state emissions and data, including for refineries, none of which are located in New York, and Part 253-2.16 requires reporting of emissions from "the volume of affected liquid fuels and petroleum products diverted to non-New York locations" and imposes on fuel suppliers the burden of demonstrating that their fuel has a final destination outside New York to avoid other extraterritorial reporting requirements. Similarly, Part 253-2.17 requires reporting of emissions from "the use of all liquefied natural gas sold or delivered to others, except for product for which a final destination outside New York can be demonstrated." As noted above, this is typically impossible to do when operating in the national integrated distribution system, but, in any event, it also results in New York directly regulating out-of-state transactions. Additionally, as explained above, Part 253 purports to allow out-of-state refineries and other facilities to be inspected by NYSDEC personnel without a warrant,[76] and anoints NYSDEC the only authority capable of issuing verification accreditation, such that where an out-of-state covered entity seeks verification from an out-of-state verifier, that out-of-state transaction is directly regulated by NYSDEC.[77]

74. Part 253 thus violates the Dormant Commerce Clause, entitling Plaintiffs to declaratory and injunctive relief enjoining enforcement of Part 253, insofar as Part 253 regulates out-of-state production, refining, supplying, or transporting of oil and/or natural gas (including liquid fuels derived therefrom).

---

[76] *See* Part 253-1.2(e)(3).
[77] Part 253-4.3.

## COUNT II

**Violation of the Constitution's Prohibition on Extraterritorial Regulation**
*(Structural Constitutional Principles; Due Process Clause; Privileges and Immunities Clause; Full Faith and Credit Clause; 42 U.S.C. § 1983; Ex Parte Young)*

75. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

76. In addition to violating the Dormant Commerce Clause by discriminating against interstate commerce, imposing substantial burdens on interstate commerce, and directly regulating out-of-state transactions, Part 253 violates the Constitution's prohibition on extraterritorial regulation, which exists under, *inter alia*, the Full Faith and Credit Clause, Due Process Clause, the Privileges and Immunities Clause, and general principles of state sovereignty and federalism.[78] Due process, for example, prohibits a state from "impos[ing] its own policy choice on neighboring States."[79]

77. Part 253 regulates extraterritorially in multiple ways, as already set forth above. For example, it imposes onerous reporting requirements regarding the out-of-state transportation of products, even though much of those fungible, commingled molecules will never enter New York State, and even though fuel producers and suppliers may have no control over whether their molecules of fuel enter the State or knowledge of how many of those molecules are ultimately combusted in New York.

78. In addition, Part 253 authorizes NYSDEC to "access any real property at which an emission source exists," even when that property is outside New York State, including to inspect

---

[78] *See Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 64 n.18 (2d Cir. 2010) (recognizing extraterritoriality claims "independently" of Dormant Commerce Clause analysis); *see also Ross*, 598 U.S. at 376 ("To resolve disputes about the reach of one State's power, this Court has long consulted original and historical understandings of the Constitution's structure and the principles of sovereignty and comity it embraces … including the Due Process Clause and the Full Faith and Credit Clause.") (internal quotations and citations omitted).
[79] *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 571 (1996).

flow meters and other measurement devices for which Part 253 also imposes New York-specific calibration requirements already subject to third party verification.[80]

79. If each of the 50 states imposed its own Part 253-style regime of detailed, overlapping GHG reporting requirements on out-of-state oil and gas entities—each with different methodologies, emissions factors, reporting formats, and deadlines—the result would be a paralyzing and irreconcilable patchwork of regulatory obligations that would likely cripple the national energy market.

80. Part 253 thus violates the Constitution's prohibition on extraterritorial regulation, entitling Plaintiffs to declaratory and injunctive relief enjoining Part 253, insofar as Part 253 regulates out-of-state production, refining, supplying, or transporting of oil and/or natural gas (including liquid fuels derived therefrom).

## COUNT III

### Violation of the First Amendment

*(U.S. Const. amend. I; 42 U.S.C. § 1983; Ex Parte Young)*

81. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

82. The First Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, prohibits the government from compelling speech.[81] The government may not compel individuals or entities to disclose information absent a sufficiently important governmental interest and a sufficiently close relationship between the compelled disclosure and that governmental interest.[82]

[80] Part 253-1.2(e)(3).
[81] *See e.g.*, *Volokh v. James*, 148 F.4th 71, 83 (2d Cir. 2025).
[82] *Id.* at 84.

83. Under strict scrutiny, the government must show that a law compelling speech is "justified by a compelling government interest and is narrowly drawn to serve that interest."[83] Restrictions on commercial speech receive intermediate scrutiny, requiring the regulation to "directly advance a substantial governmental interest" and not be "overly restrictive"[84] or "misleading."[85]

84. Part 253 compels Plaintiffs' members to disclose data on raw natural gas, crude oil, and other fuel inputs, hydrogen production, refinery yield, product slate, supplier and customer identities, transportation routes, and state-dictated emissions estimations using prescribed methodologies, including use of the 20-year GWP that is now defunct under the Climate Law. Much of this information is competitively sensitive and/or constitutes trade secrets, but Part 253 makes it subject to "mandatory" reporting as part of New York's effort to show "leadership" on global climate change, which the Supreme Court has acknowledged is a "controversial" issue.[86] Part 253's compelled disclosures are not "purely factual and uncontroversial information" subject to review under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985). Rather, Part 253 compels speech on matters of public controversy using state-prescribed methodologies and emissions factors, implicating First Amendment strict scrutiny. Far from simply providing readily available factual data, Part 253 compels fuel suppliers and others to try to link fuel consumption in New York back to specific points of origin far up or down the supply chain, an impossible task in most instances. New York's demand that Plaintiffs' members use New York-dictated methodologies to provide an estimate of GHG emissions invariably compels disclosures that reflect a particular viewpoint about those emissions.

---

[83] *Id.*
[84] *Id.* at 85; *see also Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 374 (2d Cir. 2025).
[85] *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980).
[86] *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913 (2018) (emphasis added).

85. Part 253 also does not serve the consumer-information rationale that underlies *Zauderer* review because its purpose is to implement the Climate Act, not to inform a pending commercial choice. Indeed, Part 253 plays no part in "help[ing] the [NYSDEC] make 'intelligent and well informed' *economic* decisions about" Plaintiffs' products.[87] Many of Part 253's requirements do not even address fuel products themselves.[88] For example, Part 253-2.18(b)(2) requires a fuel supplier to report "[t]he corporation's name and physical address of the fuel production facility or upstream entity that sold the fuel product to the fuel supplier." "Those are facts about third parties who [sell fuel product], not about [fuel product] itself."[89] These requirements also highlight why Part 253 is merely an overbroad and burdensome fishing expedition.

86. Part 253's compelled disclosures are not narrowly tailored to serve any compelling or substantial governmental interest. The regulation's extraordinary breadth—requiring disclosure of upstream, out-of-state emissions data, proprietary fuel characteristics, supply chain details, and commercially sensitive refinery operations—far exceeds what would be necessary for legitimate in-state environmental monitoring. Indeed, compelling disclosure of *out-of-state* information is by definition **not** *in-state* environmental monitoring. Notably, as explained above, other existing tools for estimating GHG emissions are available, but as NYSDEC explained in its Response to Comments, NYSDEC is seeking to "align" Part 253's reporting requirements "with Climate Act accounting methodologies," as opposed to those established under other existing federal regimes,[90]

---

[87] *DoorDash, Inc. v. City of New York*, No. 25-81, slip op. (2d Cir. Aug. 5, 2026) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976)).
[88] *See e.g.*, Part 253-2.18(b)(2), 2.18(b)(3) (regarding upstream entities and transportation distance and mode used to move imported fuel from the fuel production facility to the New York border); Part 253-2.18(c)(2)(vii), (viii), (x) (regarding refinery specific data); Part 253-2.16(f), 2.17(f) (regarding facility names and customer account numbers of other reporting entities).
[89] *DoorDash*, No. 25-81 at *15.
[90] NYSDEC, Assessment of Public Comments: 6 NYCRR Part 253, Mandatory Greenhouse Gas Reporting Program at 141 (Dec. 1, 2025).

a rationale which no longer holds given the recent CLCPA amendments. Moreover, the information is made publicly available by means of New York's Freedom of Information Law,[91] exacerbating the burden on protected speech by thrusting the information into public light without any corresponding furtherance of New York's statutory goals, suggesting that the State's environmental goals are a mere pretextual route to making the information public.

87. New York lacks a compelling government interest to compel disclosure of speech that is protected from such mandates. Federal GHG emissions inventories and other readily available sources already provide a reasonable means for New York to obtain an estimate of GHG emissions associated with fuels used in New York without burdening private parties, as demonstrated by NYSDEC's existing Statewide Greenhouse Gas Emissions Reports. In the alternative, simplifying Part 253's requirements to track fuels at a single point of ownership within New York would more narrowly tailor the regulation to the asserted governmental interest. However, compelling these disclosures is not shown to result in any meaningful reduction in emissions in New York or to alter the climate of New York, let alone provide any marginal benefit to New York compared to relying on publicly available information. Additionally—in light of the May 2026 amendments to the CLCPA removing out-of-state emissions from its scope—Part 253's reporting requirements concerning out-of-state product data, including emissions, no longer serve *any* government interest connected to the CLCPA.

88. Part 253's compelled disclosure requirements are unduly burdensome and result in the disclosure of speculative or misleading information. They require covered entities to generate, compile, and report vast quantities of information about operations, including out-of-state emissions, using state-mandated methodologies that differ from federal requirements and industry

---

[91] *See* Part 253-1.8.

practice, all in an attempt to support the purportedly most aggressive climate law in the United States, including by burdening energy producers (particularly out-of-state producers) that New York disfavors. Given the difficulty of compiling this information from third parties, the speculative nature of tracing molecules from New York back to upstream sources, and the availability of other data sources or a simplified reporting program, the information Part 253 mandates will be inaccurate guesswork at best and misleading at worst. The government has no legitimate interest in compelling guesswork with little public value.

89. Part 253 thus violates the First Amendment, entitling Plaintiffs to declaratory and injunctive relief enjoining enforcement of Part 253.

## COUNT IV

### Federal Preemption — Supremacy Clause
*(U.S. Const. art. VI, cl. 2)*

90. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

91. The Supremacy Clause of the United States Constitution provides that the "Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."[92] State laws that conflict with or are preempted by federal law are "without effect."[93]

92. The Clean Air Act establishes a comprehensive federal scheme for regulating GHG emissions. Congress chose the EPA to be the "primary regulator of [domestic] greenhouse gas emissions," and states are not granted "unfettered discretion to impose any environmental regulations they choose, anywhere they choose."[94]

---

[92] U.S. Const. art. VI, cl. 2.
[93] *Maryland*, 451 U.S. at 746.
[94] *City of New York*, 993 F.3d at 99.

93. Part 253 is preempted by the Clean Air Act.[95] Part 253 reaches emissions occurring outside New York and applies to entities operating primarily outside the State, exceeding the scope of permissible state action under the Clean Air Act's cooperative federalism framework.

94. Part 253 is also preempted under principles of field and conflict preemption because it imposes reporting requirements that conflict with the federal GHGRP, which currently requires approximately 8,200 facilities, suppliers, and $CO_2$ injection sites across 47 source categories to annually calculate and report their GHG emissions.[96] The federal government occupies the field of interstate emissions regulation even if, in particular circumstances, the EPA does not regulate GHG interstate emissions where it has determined that such emissions do not cause local or regional harms. In promulgating the GHGRP, the EPA relied on its information collection authority under Section 114 of the Clean Air Act.[97] Section 114(b) evinces Congress's intent to occupy the entire field of interstate GHG reporting requirements. It provides that authority to develop procedures for carrying out the Clean Air Act's reporting requirements may be delegated to a state only if "the Administrator finds the State procedure is adequate."[98] Part 253 intrudes upon the field of interstate GHG reporting because the EPA has not approved the State procedure. And it invades upon a "federal right to be free from any other [reporting] requirements."[99] Where "Congress occupies an entire field . . . even complementary state regulation is impermissible."[100] Part 253 is accordingly preempted by the Clean Air Act.

95. Part 253 incorporates by reference the 2024 version of the federal program while simultaneously imposing more stringent and broader requirements. The resulting divergence

---

[95] *See id.* at 91-92.
[96] *See generally* 40 C.F.R. Part 98. While last year the EPA proposed a rule to rescind the GHGRP, the proposed rule is still under consideration, and the GHGRP is still in place. *See* 90 Fed. Reg. 44591.
[97] 74 Fed. Reg. 56260, 64 (Oct. 30, 2009) (citing 42 U.S.C. § 7414).
[98] 42 U.S.C. § 7414(b).
[99] *Murphy v. Nat. Coll. Athletic Ass'n*, 584 U.S. 453, 479 (2018).
[100] *Arizona v. United States*, 567 U.S. 387, 401 (2012).

between state and federal reporting creates conflicting obligations and heightened enforcement risk for entities subject to both regimes.

96. Regardless of whether the federal GHGRP changes substantially or not at all, reporting of interstate GHG emissions remains squarely within the province of the federal government, not the states.[101] And even if the EPA were to choose not to require GHG emissions reporting or exercise its authority under Section 114, such a decision would still operate within the comprehensive federal regime enacted by the Clean Air Act. NYSDEC admits that Part 253's references to the federal GHGRP are static and will not be affected by any changes to those regulations, demonstrating NYSDEC's attempt to override and step into the shoes of the EPA.[102] Ultimately, Part 253's duplicative and conflicting reporting requirements undermine the cooperative federalism of the Clean Air Act and are preempted under principles of field and conflict preemption.

97. Part 253 thus violates the Supremacy Clause, entitling Plaintiffs to declaratory and injunctive relief enjoining Part 253, insofar as Part 253 regulates out-of-state production, refining, supplying, or transporting of oil and/or natural gas (including liquid fuels derived therefrom).

## COUNT V

### Violation of the Fourth Amendment —
### Unreasonable Searches and Seizures
*(U.S. Const. amend. IV; 42 U.S.C. § 1983)*

98. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

[101] *See* 42 U.S.C. 7414(b).
[102] NYSDEC, *Mandatory Greenhouse Gas Reporting Program Frequently Asked Questions: 6 NYCRR Part 253*, 5 (Mar. 2025), https://dec.ny.gov/sites/default/files/2025-03/ghgreportingfaq.pdf.

99. The Fourth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, protects against unreasonable searches and seizures. Other than rare exceptions, searches without a warrant are per se unreasonable.[103] Warrantless administrative searches of commercial premises are generally permissible only where the subject has an opportunity for pre-compliance review before a neutral decisionmaker, absent consent or exigent circumstances.[104]

100. Part 253 authorizes NYSDEC to "access any real property at which an emission source exists" without a warrant.[105] NYSDEC representatives may "traverse the property, inspect facilities, take measurements, analyze physical site characteristics, take environmental samples, [and] sketch and photograph the property."[106]

101. Part 253's provision that establishing a reporting account "may be considered written permission" for NYSDEC to access reporting entities' property[107] does not constitute valid voluntary consent. Reporting entities, including those out-of-state, are required to establish accounts to comply with Part 253.[108] Consent that is a mandatory condition of regulatory compliance is not voluntary consent within the meaning of the Fourth Amendment.[109]

102. In addition to the lack of valid consent, Part 253 lacks any mechanism for pre-compliance review before a neutral decisionmaker. While the Fourth Amendment allows for

---

[103] *Katz v. United States*, 389 U.S. 347, 357 (1967) ("searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.") (internal citations omitted).
[104] *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 420 (2015).
[105] Part 253-1.2(e)(3).
[106] *Id.*
[107] *Id.*
[108] Part 253-1.6.
[109] *See United States v. Chicago, M., St. P. & P.R. Co.*, 282 U.S. 311, 328–29 (1931) ("the right to continue the exercise of a privilege granted by the state cannot be made to depend upon the grantee's submission to a condition prescribed by the state which is hostile to the provisions of the federal Constitution."); *Calvey v. Town Bd. of N. Elba*, No. 8:20-CV-711, 2021 WL 1146283, at *9 (N.D.N.Y. Mar. 25, 2021) ("This consent, however, is not a choice, but a legal requirement. The permission to search that the property owner provides as a condition to obtaining a permit does not make a warrantless search a consensual one.").

warrantless searches if the "primary purpose of the searches is distinguishable from the general interest in crime control," then absent valid consent or exigent circumstances, "the subject of the search must be afforded an opportunity to obtain pre-compliance review before a neutral decisionmaker."[110] Part 253 provides no such opportunity.

103. Additionally, Part 253 violates the Fourth Amendment by unreasonably compelling production of private data. The Fourth Amendment's reasonableness command requires that any compelled production of records "be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome" and that the compelled party have an opportunity for "review of the reasonableness of the demand prior to suffering penalties for refusing to comply."[111] Part 253's reporting requirements fail to meet these standards. Part 253 compels sweeping, untargeted production of commercially sensitive data regarding out-of-state operations and entities indefinitely; without any tailoring, individualized suspicion, or mechanism for pre-compliance review. The scale of reporting that Part 253 compels—requiring comprehensive fuel and emissions data across a covered entity's entire supply chain, including out-of-state activities—is "breathtaking" and "dwarfs" what the Fourth Amendment permits.[112] Part 253's requirements regarding out-of-state activities are particularly unreasonable in light of the May 2026 amendments to the CLCPA, which belie any relevance to their purpose.

104. Part 253 thus violates the Fourth Amendment, entitling Plaintiffs to declaratory and injunctive relief enjoining Part 253.

---

[110] *Patel*, 576 U.S. at 420.
[111] *See v. City of Seattle*, 387 U.S. 541, 544-45 (1967); *see also Airbnb, Inc. v. City of New York*, 373 F.Supp.3d 467, 492–93 (S.D.N.Y. 2019).
[112] *See Airbnb*, 373 F.Supp.3d at 490–91.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs AFPM and API respectfully request that this Court enter judgment in their favor and against Defendants and grant the following relief:

A. A declaration, pursuant to 28 U.S.C. §§ 2201 and 2202, that 6 NYCRR Part 253 violates the United States Constitution's prohibitions against unlawful regulation of interstate commerce and extraterritorial regulation, insofar as Part 253 regulates out-of-state production, refining, supplying, or transporting of oil and/or natural gas (including liquid fuels derived therefrom);

B. A declaration, pursuant to 28 U.S.C. §§ 2201 and 2202, that 6 NYCRR Part 253 violates the First Amendment to the United States Constitution;

C. A declaration, pursuant to 28 U.S.C. §§ 2201 and 2202, that 6 NYCRR Part 253 is preempted by federal law, including the Clean Air Act, in violation of the Supremacy Clause of the United States Constitution, insofar as Part 253 requires reporting of emissions and other data regarding the out-of-state production, refining, supplying, or transporting of oil and/or natural gas (including liquid fuels derived therefrom);

D. A declaration, pursuant to 28 U.S.C. §§ 2201 and 2202, that 6 NYCRR Part 253 violates the Fourth Amendment to the United States Constitution;

E. An injunction barring Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them, from enforcing 6 NYCRR Part 253 in accordance with the declarations above;

F. An award to Plaintiffs of their reasonable costs and attorneys' fees incurred in bringing this action, pursuant to 42 U.S.C. § 1988; and

G. Such other and further legal and equitable relief as this Court deems just and proper.

Dated: August 24, 2026
New York, NY

Respectfully submitted,

**AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS**

Richard Moskowitz
(*pro hac vice* forthcoming)
Tyler Kubik
(*pro hac vice* forthcoming)
1800 M Street, N.W.
Suite 900 North
Washington, DC 20036
Tel: (202) 457-0480
rmoskowitz@afpm.org
tkubik@afpm.org

**AMERICAN PETROLEUM INSTITUTE**

Ryan Meyers
Mara E. Zimmerman
200 Massachusetts Avenue, NW
Washington, DC 20001
meyersr@api.org
zimmermanm@api.org

**BAKER BOTTS L.L.P.**

*/s/Brendan F. Quigley*
Brendan F. Quigley
30 Rockefeller Plaza
New York, New York 10112
Tel: (212) 408-2500
brendan.quigley@bakerbotts.com

Julie A. Cress (*pro hac vice* forthcoming)
101 California Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 291-6200
julie.cress@bakerbotts.com

Aaron Streett (*pro hac vice* forthcoming)
Christopher C. Thiele (*pro hac vice* forthcoming)
910 Louisiana Street
Houston, TX 77002
Tel: (713) 229-1234
aaron.streett@bakerbotts.com
chris.thiele@bakerbotts.com

Jeffrey H. Wood (*pro hac vice* forthcoming)
700 K Street, N.W.
Washington, DC 20001
Tel: (202) 639-7700
jeff.wood@bakerbotts.com

*Attorneys for Plaintiffs American Fuel & Petrochemical Manufacturers and American Petroleum Institute*